NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONTAE L. JOHNSON,<br><br>        *Plaintiff*,<br>v.<br><br>CAPT. KEITH L. STITH, et al.,<br><br>        *Defendants*. | Civil Action No. 14-5032<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendants Capt. Keith L. Stith's ("Stith") and Det. Miguel Matos' ("Matos") (together, the "Officers" or "Defendants") motions for summary judgment. ECF Nos. 53-54. For the reasons set forth below, Defendants' motions are **GRANTED**.

**I.  BACKGROUND**

This case arises from Plaintiff Dontae L. Johnson's ("Johnson" or "Plaintiff") 2013 criminal trial for jury tampering, in which Plaintiff was ultimately acquitted. Now, Plaintiff asserts malicious prosecution claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA") against Defendants, two Hudson County officers involved in the investigation and prosecution of his jury tampering case.

**A.  Quaheem Johnson's Murder Trial**

In April and May of 2011, Plaintiff's nephew Quaheem Johnson ("Quaheem") stood trial for murder in Hudson County Superior Court before the Honorable Joseph V. Isabella, J.S.C. Stith

1

R.56 Stmt. ¶¶ 1-2, ECF No. 54-2.[1]  On April 28, 2011, after deliberations had commenced, juror Tiffany Thorpe ("Thorpe") sent Judge Isabella a note stating that she felt "very uncomfortable," due at least in part to the fact that someone in the defendant's family "knows where [she] live[s]." Stith R.56 Stmt. ¶ 8; see also id., Ex. A, 4/28/11 Quaheem Johnson Trial Transcript ("4/28/11 Tr.") 3:1-9, ECF No. 54-5.  Upon further questioning by Judge Isabella, Thorpe said that she was "a little nervous," "uncomfortable," and "scared" for two reasons.  Stith R.56 Stmt. ¶ 9.  First, Thorpe said that she recognized a woman in the gallery on Quaheem's side who looked at her throughout the trial, and whom she believed lived around the corner from her.  Id. ¶ 10, 61.  Second, Thorpe explained that when she went to McDonald's on the previous day, some "guys from [Quaheem's] family" stood behind her in line and were "talking about the jury."  Id. ¶¶ 11, 57.  For instance, the men said "the Prosecutor doing all this stuff for the jury and it's not even cute, dah, dah, dah . . . ."  Id. ¶ 58.  The men never ordered anything at the restaurant.  Id.  Based on this testimony, Judge Isabella remarked that there was "clearly juror intimidation," and excused Thorpe from jury service.  Id. ¶¶ 12, 59.

---

[1] Plaintiff argues that numerous documents and statements relied upon by Defendants cannot be considered by the Court because they are inadmissible hearsay.  Pl.'s Br. at 5-6.  However, these out-of-court statements are not hearsay because they are not offered for the truth of the matter asserted.  Rather, they are offered to show what information the Officers had in their possession at the time of Plaintiff's arrest and indictment, which is necessary to determine whether probable cause existed.  See Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995) (noting that "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.").  Plaintiff's argument is therefore without merit.  See Domenech v. City of Philadelphia, No. 06-1325, 2009 WL 1109316, at *1 n.3 (E.D. Pa. Apr. 23, 2009), aff'd, 373 F. App'x 254 (3d Cir. 2010) (holding that, in a malicious prosecution case, out-of-court statements were not hearsay when they were offered to show what the police knew, which was necessary to determine whether there was probable cause at the time plaintiff was prosecuted); Smith v. Angelo, No. 14-1066, 2017 WL 2276985, at *1 n.2 (D. Del. May 25, 2017) (same); Cairel v. Alderden, 821 F.3d 823, 831 (7th Cir. 2016) (same); see also Torres v. City of Philadelphia, 673 F. App'x 233, 236 (3d Cir. 2016) (noting that "probable cause may rest upon hearsay, provided there exists 'a substantial basis for crediting the hearsay'").

After dismissing Thorpe, Judge Isabella interviewed the remaining jurors to determine whether they were still capable of rendering a fair verdict. 4/28/11 Tr. 12:24-41:7. One of the jurors, Andre Heun ("Heun"), stated that Thorpe told him over the span of a few days that she "was worried about the guys that were sitting in the back." Stith R.56 Stmt. ¶ 85. Heun also said that he was in the McDonald's with Thorpe, and heard the men "talking very loud," saying "something about jurors." Id. ¶ 13, 84; see also 4/28/11 Tr. 18:1-6. He further noted that "the whole jury itself has actually noticed these guys," and that they were "a little creepy looking." Stith R.56 Stmt. ¶ 85. He nevertheless said that he was not intimidated and could continue to serve on the jury. Id. ¶ 86.

None of the other jurors indicated that they needed to be excused. See 4/28/11 Tr. 20:3-39:17. Judge Isabella replaced Thorpe with an alternate juror, and the jury deliberation continued. 4/28/11 Tr. 40:1-42:19. However, Heun suffered a heart attack the following day, and was excused as a juror for that reason. Stith R.56 Stmt. ¶ 15; see also id., Ex. S, 10/16/13 Trial Transcript ("10/16/13 Tr.") 78:12-16, ECF No. 54-23. Heun was replaced by the only remaining alternate juror, Jaime Medina ("Medina"). Stith R.56 Stmt. ¶ 16.

On May 4, 2011, Medina wrote a note to Judge Isabella about his "family's life being threatened." Stith R.56 Stmt. ¶ 18; see also id., Ex. B, 5/4/11 Tr. ("5/4/11 Tr.") 3:5-9, ECF No. 54-6. Medina first explained that he was initially "nervous" to be a juror in the case because he lives across the street from the courthouse. Stith R.56 Stmt. ¶ 20; 5/4/11 Tr. 4:12-13. In addition, Medina said that on the previous day, he walked home and was talking to his father in front of his house when someone he suspected to be Quaheem's "brother," and whom he had noticed was present in the courtroom "every day of the case," walked by them with two of his friends. Stith R.56 Stmt. ¶¶ 19-20. As the three men walked by, one of the two friends gave Medina an

"acknowledgement smile that he knows who [he is]." Id. ¶ 20. He explained that although the men could have been walking to their homes in "the Projects," it was "too close of a coincidence these guys walked by my house," and that the event would "affect [his] decision" because he could "run into one of [Quaheem's] friends or family members in the street going to the store or something." Id. ¶ 21; 5/4/11 Tr. 5:6-25. After excusing Medina, with no more alternate jurors remaining, Judge Isabella declared a mistrial. Stith R.56 Stmt. ¶ 22; 5/4/11 Tr. 7:2.

### B. Jury Tampering Investigation

On May 5, 2011, after speaking with the assistant prosecutor who handled Quaheem's trial and learning that Judge Isabella had to declare a mistrial, Defendants Stith and Matos began investigating the two incidents of alleged jury tampering—the "McDonald's Incident" and the "Medina Incident." Id. ¶ 25. At the time, Stith was a Lieutenant in charge of the Gang Task Force in the Hudson County Prosecutor's Office. Id. ¶ 23. Matos was a Hudson County Department of Corrections employee on loan to the Gang Task Force as a Detective. Id. ¶ 24; see also 10/16/13 Tr. 25:1-19.

On May 5, 2011, Stith and Matos interviewed Medina at the Hudson County Prosecutor's Office regarding the Medina Incident. Stith R.56 Stmt. ¶ 26. On May 9, 2011, Matos prepared a report memorializing the interview. Id. ¶ 96. According to the report, on April 28, 2011, Medina asked a sheriff's officer to escort him home because he "feared for his safety." Id. ¶ 97. He told Stith and Matos that he "felt uncomfortable throughout the trial because three (3) black males that attended the trial kept giving jurors hard stares," and that he "thinks that one (1) of the males is related to the defendant, Quaheem Johnson, because Johnson and the individual look alike." Id. ¶ 98. He told the Officers that he asked to be excused from the trial on May 4, 2011. Id. ¶ 99. On the prior day, Medina "was talking to his father across the street from his home," when he

4

"whispered for his father to stop talking and that he . . . would tell his father why later." Id., Ex. D, 5/9/11 Investigation Report, ECF No. 54-8. Medina reported that "moments later three (3) men that he felt intimidated by in the trial, walked pas[t] him . . . and his father," and "one (1) of the men turned to him and smiled with a sinister look." Stith R.56 Stmt. ¶ 100. He further remarked that he "felt scared to the point that he has not slept since the incident." Id. Medina also allegedly told the Officers that in the 15 years he has owned his home, he has never seen the three men in his neighborhood, and "fears for his wife's safety and the safety of his parents who live in the house directly across the street from his residence." Id. ¶ 101.

On May 6, 2011, Matos interviewed Heun at the Hudson County Prosecutor's Office regarding the McDonald's Incident. Id. ¶ 27. Matos later prepared a report memorializing the interview. Id. ¶ 63. According to the report, Heun said that during Quaheem's trial, he "was standing behind three young black men at the McDonald's," when he heard "one of the men sa[y] very loudly, 'That fucking judge and that fucking jury think this is a fucking game! This ain't no fucking game!'" Id., Ex. E, 5/9/11 Investigation Report of Interview with Heun, ECF No. 54-9. Heun allegedly said that "the statements made him feel threatened." Stith R.56 Stmt. ¶ 65. Matos noted that Heun "strongly believes that the man who made the statement is the defendant's brother because the man looks so much like the defendant on trial." Id. ¶ 66. Heun also told Matos that "after the men were served, the men went into the dining room to the left of the front counter and continued making the same intimidating statements over and over again." Id. ¶ 67. He further indicated that he "felt uncomfortable during the trial because the three men that he previously mentioned were giving the jurors hard looks throughout the trial." Id. ¶ 68.

On May 9, 2011, Stith interviewed Thorpe over the telephone regarding the McDonald's Incident, and memorialized the interview in a report. Id. ¶¶ 28, 51. According to the report, Thorpe

5

said that she "asked to be excused from the trial . . . based on an incident that took place on May 27, 2011[2] at the McDonald's Restaurant" near the Hudson County courthouse, involving "the defendant's brother, Dontae Johnson and two unidentified black males." Id. ¶ 52. Thorpe further explained that "she and other jurors went to lunch at the McDonald's Restaurant," and that "while the jurors were ordering their food, the defendant's brother and two unidentified black males were using profane language and making comments about the jurors, prosecutor and judge." Id. ¶ 53. Thorpe allegedly could not recall exactly what had been said in the McDonald's. Id. ¶ 54. When she had received her food, she "left the restaurant because she felt threatened," and requested a meeting with Judge Isabella during deliberations the following day. Id. At the end of the interview, Thorpe also told Stith that "the defendant's family lives around the corner from her home." Id. ¶ 55.

On May 16, 2011, Matos obtained soundless video surveillance footage of the McDonald's Incident. Id. ¶ 30.

That same day, Matos conducted a second interview with Heun, and prepared a report memorializing the interview. Id. ¶ 69. Heun had "agreed to view the video and identify the individuals that threaten[ed] the jurors" at McDonald's. Id., Ex. G, 5/16/11 Investigation Report of Heun Interview ("5/16/11 Investigation Report – Heun Interview"), ECF No. 54-11. Upon viewing the video, Heun "immediately pointed out the man he called 'the defendant's brother' and two unidentified black males on the video." Stith R.56 Stmt. ¶ 70. As the video played, Heun explained that "as the jurors were ordering food, the 'defendant's brother' and two black males were in line in front of him," when Plaintiff "and the two black males stated loudly that 'the

---

[2] It appears that Stith incorrectly indicated that the event occurred on May 27, 2011, as it actually occurred on April 27, 2011. See Stith R.56 Stmt., Ex. F, 5/9/11 Investigation Report of Thorpe Interview, ECF 54-10; Defs.' Resp. R.56 Stmt. ¶ 86, ECF No. 64-1.

6

prosecutor and jurors think this is a fucking joke.'" Id. ¶ 71-72. Heun explained that "he and the other jurors became very uncomfortable." 5/16/11 Investigation Report – Heun Interview. He further indicated that "after [Plaintiff] and the two black males purchased their food, they sat in the same section of McDonald's with a juror," who "was very upset about the incident in the McDonalds" when she returned to the jury room. Stith R.56 Stmt. ¶ 73. Heun reportedly became ill while viewing the video, and asked to continue the interview at a later time. Id. ¶ 74. The report notes that subsequent to Heun's identification, "the Gang Task Force identified 'the defendant's brother' as Dontae Johnson, the defendant's nephew." 5/16/11 Investigation Report – Heun Interview.

Also on May 16, 2011, Stith called a "reliable [c]onfidential [i]nformant that knows Quaheem Johnson" to ask whether he knew if Quaheem had a brother. Stith R.56 Stmt. ¶ 33. The confidential informant told Stith that he was unaware if Quaheem has a brother, but said that he has a nephew named Dontae Johnson that "looks exactly like him." Id. ¶ 34. Stith then showed the confidential informant a photograph of Plaintiff from the New Jersey Division of Motor Vehicles, and the informant "positively identified the person in the photograph as Dontae Johnson." Id. ¶ 35. Stith also noted that "Dontae Johnson is the same person in the video that Det. Matos received from McDonald's." Id., Ex. H, 5/16/11 Investigation Report re: Confidential Informant ("5/16/11 Investigation Report-Confidential Informant"), ECF No. 54-12.

**C. Plaintiff's Jury Tampering Proceedings**

On June 3, 2011, Matos applied for and obtained a Complaint-Warrant to arrest Plaintiff for jury tampering in violation of N.J. Stat. Ann. § 2C:29-8. Stith R.56 Stmt. ¶ 37; Id., Ex. I, Complaint-Warrant ("Complaint-Warrant"), ECF No. 54-13. The statute provides:

> Any person who, directly or indirectly, corrupts, influences or attempts to corrupt or influence a jury or juror to be more favorable

7

> to the one side than to the other by promises, persuasions, entreaties, threats, letters, money, entertainment or other sinister means; or any person who employs any unfair or fraudulent practice, art or contrivance to obtain a verdict, or attempts to instruct a jury or juror beforehand at any place or time, or in any manner or way, except in open court at the trial of the cause, by the strength of the evidence, the arguments of the parties or their counsel, or the opinion or charge of the court is guilty of a crime.

N.J. Stat. Ann. § 2C:29-8. In addition to a general description of Plaintiff's alleged violation of the statute, the warrant stated: "Probable Cause: Trial record of State v. Quaheem Johnson," as well as "interviewing of jurors and subsequent identification of the Defendant." Complaint-Warrant at 1.

That same day, Plaintiff was arrested at his apartment, charged with jury tampering, and subsequently detained on one million dollars cash bond. Stith R.56 Stmt. ¶ 38; see also id., Ex. K, 6/3/11 Arrest Report, ECF No. 54-15. His bail was later reduced on December 16, 2011 to $250,000 cash bond, and on March 19, 2012 to $75,000. Stith R.56 Stmt. ¶¶ 41, 43.

On December 6, 2011, Hudson County Assistant Prosecutor Michael D'Andrea presented the jury tampering charge against Plaintiff to a grand jury.[3] Id. ¶ 40. On December 20, 2011, the grand jury returned a one-count indictment charging Plaintiff with first-degree jury tampering in violation of N.J. Stat. Ann. § 2C:29-8. Id. ¶ 42.

On October 15, 2013, Plaintiff's jury tampering trial commenced before the Honorable Frederick J. Theemling, Jr., J.S.C., and continued over the course of October 16, 2013 and October 17, 2013. Id. ¶ 44. During the trial, Matos, Heun, and Medina testified for the State. Id. ¶ 45. On

---

[3] Matos conducted a second interview of Heun on October 7, 2011, in which Heun elaborated on his identification of Plaintiff and further narrated the audio-less video. Stith R.56 Stmt ¶ 39. Matos also prepared a report on this interview and that report was presented to the Grand Jury. Id. ¶ 75. Since the Court must examine whether Matos and Stith had probable cause to arrest Plaintiff as of June 3, 2011, when Plaintiff was arrested, the Court does not consider this additional evidence on this Motion.

October 16, 2013, at the close of the State's case, Plaintiff's counsel made a motion to dismiss. Id. ¶ 48. After hearing arguments regarding the strength of the evidence on both sides, Judge Theemling denied Plaintiff's motion. Id. ¶ 49. On October 17, 2013, the jury returned a verdict of "[n]ot guilty," and on October 23, 2013, Judge Theemling entered a Judgment of Acquittal. Id. ¶ 50.

### D. Procedural History

On July 7, 2014, Plaintiff brought an action against Defendants in New Jersey Superior Court, Hudson County and on August 11, 2014, Defendant Matos removed this case to federal court. ECF No. 1. On February 27, 2015, Plaintiff filed an Amended Complaint, asserting one count of malicious prosecution under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6–1, *et seq.*[4] ECF No. 18. On March 13, 2015, Defendant Stith filed a Motion to dismiss the Amended Complaint. ECF No. 21.

On August 20, 2015, the Court issued an opinion dismissing Plaintiff's claims against Stith in his official capacity and all claims against Stith arising from his testimony before the grand jury and at trial. ECF No. 32; Johnson v. Stith, No. 14-5032, 2015 WL 4997413, at *4 (D.N.J. Aug. 20, 2015). However, the Court denied the motion to dismiss the malicious prosecution claim against Stith in his individual capacity. Johnson, 2015 WL 4997413, at *4-6.[5] On February 7, 2017 and February 10, 2017, Defendants Matos and Stith filed the instant motions for summary judgment. ECF Nos. 53, 54.

## II. LEGAL STANDARD

---

[4] Because "the New Jersey Civil Rights Act is interpreted analogously to 42 U.S.C. § 1983," they will be addressed together. Coles v. Carlini, 162 F. Supp. 3d 380, 404 (D.N.J. 2015) (quotation omitted).
[5] Although Defendant Matos did not move to dismiss, Matos and Stith are similarly situated, so the Court will apply its prior holdings against Matos as well.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). "Summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). When the Court considers a motion for summary judgment, "all facts and inferences are construed in the light most favorable to the non-moving party." Boyle v. Cty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).

## III. ANALYSIS

Plaintiff alleges that Defendants made several misrepresentations and false statements during the investigation and grand jury proceedings, and that but for these fabrications, there would not have been probable cause to initiate criminal proceedings against him. Defendants maintain that even without the alleged fabrications, there was probable cause to arrest and seek an indictment against Plaintiff.[6] The Court agrees with Defendants.[7]

---

[6] Defendants also argue that Plaintiff is collaterally estopped from contesting the issue of probable cause at the time of his arrest because, during his trial, the trial court denied his motion to acquit at the close of the State's case. But the standard for granting that motion is not the same as the standard for determining the existence of probable cause. The trial court based its decision on
> [W]hether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

State v. Reyes, 50 N.J. 454, 458-59 (1967). The issue on this Motion is whether the Defendant officers had probable cause to arrest Plaintiff at the time of the arrest, not based on evidence produced at trial. See Beck v. Ohio, 379 U.S. 89, 91 (1964). Given the different standards, collateral estoppel does not bar Plaintiff's claims.

[7] Whether the Court analyzes this question in the context of qualified immunity or on the merits of Plaintiff's malicious prosecution claim, the same result is reached. If, after excising the offending evidence, there was still probable cause to initiate criminal proceedings against Plaintiff,

To prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish that: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Halsey v. Pfeiffer, 750 F.3d 273, 296-97 (3d Cir. 2014) (quotation omitted). Similarly, under New Jersey law, a plaintiff must show that the defendant "(1) instituted proceedings (2) without probable cause and (3) with legal malice; and (4) the proceedings terminated in favor of the plaintiff." Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 248 (3d Cir. 2001).

The parties' dispute centers on whether Defendants had probable cause to initiate criminal proceedings against Plaintiff. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Goodwin v. Conway, 836 F.3d 321, 327 (3d Cir. 2016) (quotation omitted). Probable cause "requires more than mere suspicion; however it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti, 71 F.3d at 482–83. A "district court may conclude that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788–89 (3d Cir. 2000) (quotation omitted).

---

his malicious prosecution claim fails on the merits and Defendants are entitled to qualified immunity because Plaintiff cannot make out the deprivation of a constitutional right.

11

Here, Plaintiff was arrested pursuant to a warrant, which "generally establishes the proceeding was initiated with probable cause," but "'does not, in itself, shelter an officer from liability'" for malicious prosecution. Waters v. Cheltenham Twp., No. 16-2570, 2017 WL 3038125, at *3 (3d Cir. July 18, 2017) (quoting Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000)). If, as here, the plaintiff challenges the existence of probable cause, the Court "must determine whether the officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant,'" and if so, "whether 'such statements or omissions are material, or necessary, to the finding of probable cause.'" Id. (quoting Wilson, 212 F.3d at 787). In other words, the Court must assess "whether a prudent officer would reasonably believe, based on the non-fabricated evidence, that the defendant committed the crime." Stolinski v. Pennypacker, 772 F. Supp. 2d 626, 644 (D.N.J. 2011).

Because Defendants first initiated a criminal proceeding by obtaining a Complaint-Warrant for Plaintiff's arrest on June 3, 2011,[8] the Court must determine whether the non-fabricated evidence possessed by Defendants at that time amounted to probable cause. Generally, the Third Circuit requires courts to reconstruct the affidavit of probable cause by "'excis[ing] the offending inaccuracies and insert[ing] the facts recklessly omitted.'" Dempsey v. Bucknell University, 834 F.3d 457, 470 (3d Cir. 2016) (quoting Wilson, 212 F.3d at 789). However, where there never was

---

[8] Although the parties do not address whether obtaining a Complaint-Warrant for an arrest constitutes the initiation of criminal proceedings, the Court will treat it as such. See Restatement (Second) of Torts § 654, Comments C & E (1977) (stating that "[c]riminal proceedings are usually instituted by the issuance of some form of process, generally a warrant for arrest," but may even be initiated "without the issuance of any process, or indictment or information," such as by "lawful and valid arrest of the accused on a criminal charge"); Kelly v. Jones, 148 F. Supp. 3d 395, 400–01 (E.D. Pa. 2015) (assuming for the sake of the motion that "bringing [the plaintiff] into custody would suffice to meet the first element of a malicious prosecution claim"); Grendysa v. Evesham Twp. Bd. of Educ., No. 02-1493, 2005 WL 2416983, at *10 (D.N.J. Sept. 27, 2005) (holding that a detective initiated criminal proceedings against the plaintiff when he "completed an Affidavit of Probable Cause" and "arrested [the defendant]").

an affidavit of probable cause,[9] the prudent course is to address what information the Defendant officers had at the time of Plaintiff's arrest and whether that information amounts to probable cause.

The Complaint-Warrant identifies the evidence that supported a finding of probable cause: (1) the "trial record of State v. Quaheem Johnson"; (2) "interviewing of jurors"; and (3) "identification of the defendant." Complaint-Warrant at 1. Plaintiff alleges that this evidence was insufficient because Defendants made three false statements in the reports generated from their interviews with jurors.

First, Plaintiff claims that Matos falsely reported that during a May 9, 2011 interview, Medina told him that one of the individuals that walked past his house "turned to him and smiled with a sinister look." Stith R.56 Stmt. ¶ 100. Plaintiff notes that on other occasions, Medina said that this individual only gave him an "acknowledgement smile that he knows who [Medina is]," or a "how you doing kind of smile." Id. ¶¶ 20, 104, 112. And in his deposition, Medina testified that he never told anyone that he received a "sinister look." Id., Ex. X, 5/5/16 Medina Dep. Tr. 11:11-14.

Second, Plaintiff takes issue with the fact that Matos wrote in a May 9, 2011 report that Heun told him that "after the men were served [at McDonald's], the men went into the dining room to the left of the front counter and continued making the same intimidating statements over and over again." Stith R.56 Stmt. ¶ 67. Plaintiff points to other occasions where Heun indicated that

---

[9] By Text Order dated August 23, 2017, the Court ordered Defendants to "submit a copy of any affidavit that was submitted to the state court Judge on June 3, 2011 in support of the Complaint-Warrant." ECF No. 65. In response, Matos explained that no separate affidavit was submitted; that, as set forth in the Complaint-Warrant, probable cause was established by the trial record, interviews with jurors, and the identification of Plaintiff; and that these facts were orally conveyed to Judge Isabella. ECF No. 71. Under New Jersey law, such a procedure is permissible. See N.J. Ct. Rule 3:3-1.

13

he did not hear Plaintiff "continue talking loud [or] making other statements," and that "after that comment was made[,] nothing else was said . . . that [he] heard." Id. ¶¶ 81, 93.

Third, Plaintiff alleges that Medina never told Matos that three "black males that attended the trial kept giving jurors hard stares," as Matos recorded in his May 6, 2011 investigation report Id. ¶ 98. Medina later testified in his deposition that he never told anyone that Plaintiff gave him "hard stares" throughout the trial. Id. ¶ 119.[10]

Even assuming that Defendants did fabricate these statements, the remaining non-fabricated evidence was nonetheless sufficient to give Defendants probable cause to initiate criminal proceedings against Plaintiff for jury tampering. On two separate occasions, jurors in Quaheem Johnson's murder trial had interactions with Plaintiff and came away feeling intimidated. This was demonstrated plainly by the trial court's on-the-record questioning of the jurors, whose testimony is not challenged here as having been fabricated.

First, Thorpe explained that at a McDonald's near the courthouse, Plaintiff and two other individuals were talking loudly about the jury, prosecutor, and judge in the presence of several jurors. Id. ¶¶ 56-60. She said that the men never ordered anything at the restaurant. Id. ¶ 58. Based on this testimony, Judge Isabella excused Thorpe from jury service. Id. ¶ 12. Judge Isabella also remarked that there was "clearly jury intimidation." Id. ¶ 59.

Thorpe's disconcerting story was then corroborated by Heun. He explained to Judge Isabella that he was in the McDonald's with Thorpe, and heard the men "talking very loud," saying

---

[10] Plaintiff also makes repeated references to allegedly perjurious statements and material omissions Stith made to the grand jury and during Plaintiff's trial. See, e.g., Opp'n to Matos Motion at 16-17, ECF No. 59; Pl.'s Resp. R.56 Stmt. ¶¶ 40, 42, ECF No. 58; Pl.'s R.56 Stmt. ¶¶ 92, 94, 96-97, 102. However, the Court has already held that Stith is entitled to absolute immunity for such testimony. See Johnson, 2015 WL 4997413, at *4. Such statements and omissions are therefore irrelevant to the instant inquiry.

"something about jurors."  Id. ¶ 13, 84; see also 4/28/11 Tr. 18:1.  Heun also told Judge Isabella that Thorpe had told him over the span of a few days that she "was worried about the guys that were sitting in the back."  Stith R.56 Stmt. ¶ 85.  And he acknowledged that "the whole jury itself has actually noticed these guys," and that they were "a little creepy looking."  Id.

And in a separate incident a week later, after Thorpe had already been dismissed due at least in part to alleged jury intimidation, Medina wrote a note to Judge Isabella about his "family's life being threatened."  Id. ¶ 18.  Medina explained that three individuals, including one that he believed to be Quaheem Johnson's brother, walked right by his house and one of them gave him an "acknowledgement smile that he knows who [he is]."  Id. ¶ 20.  He remarked that it was too coincidental that these people, who he had seen present at the trial every day, would be walking by his house, and that he was afraid for his family's safety.  Id. ¶ 21.  Because he said that this experience would affect his decision in the case, he was dismissed and Judge Isabella was forced to declare a mistrial.  Id. ¶ 22.

Importantly, the details elicited in the underlying criminal case were further corroborated by Matos and Stith through interviews with all three dismissed jurors.  In each of these interviews, the jurors reiterated that they had been alarmed by Plaintiff and his associates' actions, and provided detailed accounts of the McDonald's Incident and Medina Incident.  See id. ¶¶ 51-55, 63-68, 97-101.  In addition, Matos obtained video surveillance footage of the McDonald's Incident, which depicted the scene.  Id. ¶ 30.  He even had Heun narrate a portion of the events dictated in the footage, during which Heun specifically identified Plaintiff as the individual that had threatened the jurors at McDonald's.  Id. ¶¶ 78-82.  And finally, to confirm that Plaintiff was the individual that each of the jurors had recognized as Quaheem Johnson's relative, Matos reached

15

out to a reliable confidential informant who confirmed that Plaintiff is Quaheem Johnson's nephew and "looks exactly like him." Id. ¶ 34.

It may be true, as Plaintiff alleges, that Defendants somewhat embellished—or worse, purposefully lied about—what the jurors said in their interviews. Nevertheless, the remaining non-fabricated evidence was more than sufficient to give them probable cause to believe that Plaintiff had "directly or indirectly, corrupt[ed], influence[d] or attempt[ed] to corrupt or influence a jury or juror to be more favorable to the one side than to the other." N.J. Stat. Ann. § 2C:29-8.

Plaintiff also advances several additional arguments for why probable cause was lacking. None of them is persuasive.

Plaintiff first argues that Matos obtained an arrest warrant for Plaintiff without identifying him as the individual who committed the alleged acts. The evidence before the Court demonstrates otherwise. At the underlying criminal trial, each of the three dismissed jurors explained where the individuals involved in the McDonald's Incident and Medina Incident sat in the courtroom, and each remarked that one of the culprits looked like Quaheem Johnson and was likely his brother or other relative. See id. ¶¶ 11, 19-20, 85, 103-05. During subsequent interviews with Stith and Matos, all three of the dismissed jurors reiterated these observations. See id. ¶¶ 53-55, 66, 98. And during his interview, Heun specifically identified Plaintiff as the one who made the statement in McDonald's from the surveillance video of the incident. Id. ¶ 70-71.

Moreover, after these identifications, Stith called a reliable confidential informant to inquire as to whether Quaheem had a brother. The informant explained that Quaheem has a nephew that "looks exactly like him." Id. ¶ 34. The informant then positively identified a New Jersey Division of Motor Vehicles photograph of Plaintiff as Dontae Johnson, Quaheem's nephew. Id. ¶ 35. In reports, Stith concluded that "Dontae Johnson is the same person in the video that Det.

16

Matos received from McDonald's," and that the Gang Task Force identified 'the defendant's brother' as Dontae Johnson, the defendant's nephew." 5/16/11 Investigation Report-Confidential Informant; 5/16/11 Investigation Report – Heun Interview. In light of this evidence, Plaintiff's identification argument is unavailing.

Plaintiff also repeatedly cites to Defendants' subjective beliefs about whether probable cause would have existed in certain hypothetical situations. See, e.g., Pl.'s R.56 Stmt. ¶¶ 5, 36, 54, ECF No. 58-1. A probable cause determination focuses on the "information that the arresting officer has at the time." Gilles v. Davis, 427 F.3d 197, 206 (3d Cir. 2005). But "a probable cause inquiry is entirely objective," and thus an officer's "view of the evidence is relevant only to the extent it explains what facts were available to him" when he made the decision to initiate criminal proceedings. Halsey, 750 F.3d at 299–300. Defendants' subjective views of the evidence are simply irrelevant as to whether a reasonable officer would have believed that, under the totality of the circumstances, Plaintiff committed the crime of jury tampering.

Further, Plaintiff maintains that there was no probable cause because Defendants "had not ascertained Plaintiff's intent" at the time of his arrest. Opp'n to Stith Motion at 8, ECF No. 57. Courts have noted that "because 'the practical restraints on police in the field are great[] with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great.'" Zalaski v. City of Hartford, 723 F.3d 382, 393 (2d Cir. 2013) (quoting Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004)). Indeed, an "officer considering the probable cause issue in the context of crime requiring a mens rea on the part of the suspect will always be required to rely on circumstantial evidence regarding the state of his or her mind," and may ultimately have to "make a judgment call regarding plaintiff's state of mind." Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir. 2000). Under the totality

17

of the circumstances—Plaintiff was identified by three separate jurors as engaging in conduct that could be viewed as intimidating; the judge in the underlying criminal case believed that jury intimidation had occurred and declared a mistrial, in part, due to those concerns; there was video surveillance footage that corroborated one of the incidents; and the events occurred in the midst of the prosecution of Plaintiff's close family member for murder—it was reasonable for Defendants to conclude that Plaintiff had "directly or indirectly, corrupt[ed], influence[d] or attempt[ed] to corrupt or influence a jury or juror to be more favorable to the one side than to the other," in violation of N.J. Stat. Ann. § 2C:29-8.

And finally, Plaintiff contends that Defendants failed to undertake further investigations to uncover specific facts that may have negated probable cause. For example, Plaintiff states that Matos "never ascertained whether the three men walking by Medina's home were on their way to the public housing area," rather than to intimidate him. Pl.'s R.56 Stmt. ¶ 43. But an officer is "not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed." Merkle, 211 F.3d at 790 n.8. Defendants conducted a diligent investigation—consisting of interviews with each of the jurors, retrieval and review of the video surveillance, and communication with an informant to obtain an identification of Defendant—and reasonably believed that probable cause existed at the time of Plaintiff's arrest. No further investigation was required.[11]

As Plaintiff has failed to demonstrate that criminal proceedings were initiated against him without probable cause, his malicious prosecution claim must be dismissed.

## IV. CONCLUSION

---

[11] The Court notes that even after Plaintiff was arrested, Defendants did not cease their investigation, and continued interviewing witnesses to obtain additional evidence. See, e.g., Stith R.56 Stmt. ¶¶ 75-82.

For the reasons set forth herein, Defendants' motions for summary judgment are **GRANTED**. An appropriate Order accompanies this Opinion.

**Dated: September 18, 2017**

>	*/s Madeline Cox Arleo*
>	**Hon. Madeline Cox Arleo**
>	**United States District Judge**